# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| JERRY CRAIN | No. 56976-1-II |
| Appellant, | |
| v. | |
| STATE OF WASHINGTON EMPLOYMENT SECURITY DEPARTMENT, | UNPUBLISHED OPINION |
| Respondent. | |

GLASGOW, C.J.—Jerry Crain was discharged from Pacific Breeze Products in 2020. The Employment Security Department initially granted him unemployment benefits. Pacific Breeze appealed the Department's decision, alleging that it discharged Crain for misconduct, making him ineligible for unemployment benefits. After a hearing, an administrative law judge (ALJ) made several factual findings that included credibility determinations and concluded that Pacific Breeze discharged Crain for misconduct. Therefore, Crain was not entitled to unemployment benefits.

The Commissioner of the Employment Security Department affirmed the ALJ's order, adopting the ALJ's findings of fact and conclusions of law. The Pierce County Superior Court also affirmed.

On appeal, Crain challenges a number of the ALJ's factual findings and argues that the facts do not support the conclusion that Pacific Breeze discharged him for misconduct. We affirm and hold that Crain is not entitled to unemployment benefits.

FACTS

I. BACKGROUND

In 2015, Crain began working as a full-time territory route driver for Pacific Breeze. He was responsible for providing services and sales on a specific route. Pacific Breeze later promoted Crain to a territory manager, a role in which he had to maintain a partial route and supervise two employees.

Pacific Breeze discharged Crain in 2020. Crain applied for unemployment benefits, and the Employment Security Department approved unemployment benefits for Crain in July of that year. In August, Pacific Breeze appealed the Department's grant of unemployment benefits, alleging that Crain was discharged for insubordination. A person who has been discharged for misconduct connected with their work is not eligible for unemployment benefits. RCW 50.20.066(1).

II. ADMINISTRATIVE HEARING

In January 2021, an ALJ held a hearing to address whether Crain was discharged for misconduct. Crain represented himself. Pacific Breeze was represented by Sales and Route Manager, John Murphy and Vice President, Chris Wytovicz.

A.      Pacific Breeze's Account of Crain's Job Performance

Murphy testified that when Pacific Breeze promoted Crain, he took "a day's worth of work" off Crain's plate so Crain could handle his new responsibilities. Clerk's Papers (CP) at 35. Nonetheless, Crain was not finishing his weekly route. When Murphy "took another day's worth of work away," Crain continued to have the same problem. *Id.* And in spite of Murphy's requests, Crain did not prioritize unfinished work from a given week during the following week.

Murphy said Crain was "quite capable of doing the job," but he "didn't buy into the idea of" organizing his route in a particular manner. CP at 36. Murphy said Crain explained his actions by stating "that he knew better how to do these things, and that he was going to do it his way." CP at 38. Murphy reported Crain would sometimes promise to do his work differently, but "then he'd just go do it the way he wanted to do it." *Id.* For example, Murphy once rode with Crain and saw that Crain was not following his instructions. Murphy said he and Crain had "an excellent conversation" and "agreed that those things would be fixed," but while Crain "fixed them somewhat," he still did not finish his work and "wasn't on board entirely" with Murphy's directions. CP at 36.

Wytovicz testified that as a route manager, Murphy's job was to tell territory managers like Crain how and when to do their routes. A territory manager is supposed to follow the route manager's instructions. Wytovicz also testified that Murphy had been with Pacific Breeze for 37 years and "[knew] what [he was] doing." CP at 44. Nevertheless, once a week, Wytovicz told Crain to listen to Murphy, and Crain responded that he knew the routes better than Murphy did. At the end of these weekly conversations, Crain eventually agreed to do things the company's way, but when Wytovicz later "look[ed] at [his] numbers," he could tell Crain was not following his instructions. CP at 43. Wytovicz ultimately concluded, "I can't bridge these two together. [Crain] is just insubordinate to his senior manager." *Id.*

The fact that Crain consistently failed to finish his route caused Pacific Breeze to lose revenue. For example, Pacific Breeze once lost $300 or $400 because a client received services late, so the company was unable to charge that client. Additionally, because Crain's time "was

3

always filled with his route," he did not have time to carry out managerial tasks, such as riding with other employees and checking their work. CP at 37.

Murphy acknowledged that Crain never got written warnings about his performance. Murphy said that he always addressed problems with Crain verbally. He explained that he never intended to fire Crain and was trying to work with him.

B.      Crain's Account of his Job Performance

In contrast, when asked about the reason for his discharge, Crain testified that Murphy said he "was not being fired for misconduct or any . . . company policy violations." CP at 46-47. Crain said that in his five years at Pacific Breeze, he never received any writeups or got "called into the office and sat down about [his] attitude[] or how [his] work was being done." CP at 47. He said that about a month and a half before Pacific Breeze discharged him, he had a face-to-face conversation with Murphy, and Murphy said he had no problem with the way Crain was working.

Crain explained that he had been doing the delivery routes for a few years and he felt there were different ways to do them. When asked whether he would follow Murphy's directions or do the routes the way that he thought was better, Crain said it depended on what area he was working in. He said that 95 percent of the time, he completed the routes according to Murphy's instructions, and he deviated from instructions to account for changing conditions.

Crain testified that he and Murphy had some conversations about how he was prioritizing his routes, "but it was all based on . . . other factors that [he] had going on with just not being a route guy and . . . managing two team members." CP at 47-48. He said he always got his work done, although he later testified to having a "couple of conversations" with Murphy about prioritizing work he had not completed on time. CP at 60. Additionally, Crain said Murphy's

decision to take work off his plate was not "totally explained to [him]," but he later said Murphy took the work away because Crain had to coach other team members. CP at 61.

C.     Crain's Behavior Toward Colleagues and Customers

In addition to testifying about Crain's job performance, Murphy testified about Crain's interactions with colleagues and customers. Murphy said Crain berated a fellow employee twice. Moreover, Murphy said Pacific Breeze received a couple of customer complaints because of the way Crain spoke to the customers. In one instance, a customer called to complain about not receiving hand sanitizer and Crain talked with her about the problem. After the conversation, the customer said Crain "had a terrible attitude" and did not listen to her concern. CP at 89.

Crain denied ever berating his colleague. He said he talked with the employee about work for two minutes, the rest of the conversation was personal, and the employee called him the next day to say he was looking forward to working with him. Crain also testified that no customers complained about him. He later acknowledged that one customer complained, but he said he was never rude to her.

D.     Crain's Discharge

In Wytovicz's testimony and in an email admitted as an exhibit, Wytovicz recounted the conversation in which he discharged Crain.[1] He said when Murphy spoke with Crain about berating an employee, Crain raised his voice at Murphy and "became very argumentative." CP at 179. Wytovicz asked Crain "to stop and he would not stop." *Id.* Eventually, Wytovicz told Crain he could not work with him anymore because he was "not listening to a word [he was] saying"

---

[1] Wytovicz sent the email to Alexa Wytovicz, an executive assistant, on April 15, 2020. Crain was discharged on April 7, 2020.

and "arguing with everything [Murphy] ever asked [him] to do." *Id.* Wytovicz then discharged Crain.

In contrast, Crain testified that he had been argumentative with Murphy only once or twice. He also said he had never spoken with Wytovicz "in an argumentative or over-talking manner." CP at 52-53.

E.      Administrative Law Judge Ruling

The ALJ concluded that Pacific Breeze discharged Crain "for misconduct as defined by RCW 50.04.294." CP at 197. The ALJ concluded that Crain's conduct showed "willful or wanton disregard for the interests of the employer and fellow employees, and was a deliberate violation or disregard of standards of behavior which the employer has the right to expect of an employee." *Id.* In so concluding, the ALJ relied on several factual findings. After "weighing all the evidence, including demeanor (as determined by voice, attitude, straightforwardness, unreasonable hesitancy in responses), party motivations, the reasonableness and consistency of the testimony . . . and whether the testimony was based on first-hand knowledge or hearsay," the ALJ found that Crain's "testimony lacked credibility, and the testimony offered by [Pacific Breeze] was more credible." CP at 194 (Findings of Fact (FF) 4).

Having made this credibility determination, the ALJ made several findings. The ALJ found, "Another employee reported to [Murphy] that [Crain] berated them." *Id.* (FF 6). "On multiple occasions, [Crain's] supervisor . . . told [Crain] to schedule his routes and perform his job duties in a specific way. [Crain] would agree to do so, but then would disregard his supervisor's instructions and follow his own priorities." *Id.* (FF 7). Crain "was capable of performing his job duties, but he chose not to follow [Pacific Breeze's] direction." *Id.* (FF 8).

6

The ALJ also found that "[p]rior to being fired, [Crain] did not receive any written warnings." *Id.* (FF 9). Pacific Breeze "tries to keep their employees and coach them if there are problems. As a rule, [Pacific Breeze] does not provide written warnings to employees because [Pacific Breeze] prefers to speak with the employee directly about the problem and try to address it that way." *Id.* (FF 10).

The ALJ also found that Crain's "actions caused problems for [Pacific Breeze], including customer complaints, lost revenue and [Crain's] failure to properly supervise his own subordinates." *Id.* (FF 11). "The final straw for [Pacific Breeze] was a phone call between [Wytovicz] and [Crain] about [Crain's] conduct. [Crain] would not listen to [Wytovicz], and spoke over him." *Id.* (FF 12).

The ALJ found that Pacific Breeze discharged Crain "because of his deliberate refusal to follow the reasonable directions of [Pacific Breeze] and because of his insubordination." CP at 195 (FF 14). Ultimately, the ALJ found that by a preponderance of the evidence, Crain was discharged for misconduct. The ALJ concluded that Crain's conduct met the statutory definition of misconduct. Therefore, Crain was not entitled to unemployment benefits, and the ALJ remanded Crain's case to the Department of Employment Security for the calculation of any sum Crain might need to pay back.

### III. APPEAL TO THE EMPLOYMENT SECURITY COMMISSIONER

Crain filed an appeal to the Employment Security Department's Commissioner challenging the ALJ's denial of benefits. He argued that the record did not support the conclusion that Crain committed misconduct and such misconduct was the reason for his discharge. Crain also challenged several of the ALJ's factual findings.

The Commissioner affirmed the ALJ's order, adopting the findings of fact and conclusions of law. The Commissioner concluded that Pacific Breeze met its burden of showing misconduct by a preponderance of the evidence under several provisions of RCW 50.04.294(1). Specifically, the Commissioner concluded that Crain showed "willful and wanton disregard of [the] rights, title and interests" of the employer under RCW 50.04.294(1)(a) because his "conduct evinced insubordination showing a deliberate, willful, or purposeful refusal to follow the reasonable directions or instructions of the employer" under 50.04.294(2)(a). CP at 257. The Commissioner also concluded that Crain's conduct was "in deliberate violation and disregard of standards of behavior which an employer has the right to expect of an employee" under RCW 50.04.294(1)(b). *Id.*

The Commissioner explained that his decision turned "upon a credibility finding made by the administrative law judge," and that the judge was in "the best position to weigh the evidence and make findings as to its credibility." CP at 256-57. The Commissioner added that a "thorough review of the record" showed that "on issues crucial to proper resolution of this matter, the testimony of the employer's witnesses" was more credible than Crain's testimony.[2] CP at 257.

IV. APPEAL TO SUPERIOR COURT

Crain petitioned for judicial review of the Commissioner's decision to Pierce County Superior Court. Crain argued again that the administrative record did not support the conclusion that Crain committed misconduct. He also challenged the following factual findings: that Crain berated another Pacific Breeze employee; that Crain disregarded his supervisor's instructions and

---

[2] The Commissioner has the power to make their own findings of fact and set aside or modify the administrative law judge's findings. *Tapper v. Emp't Sec. Dep't*, 122 Wn.2d 397, 404, 858 P.2d 494, (1993).

followed his own priorities; that Crain was capable of performing his job duties but chose not to follow instructions; that Pacific Breeze does not provide written warnings to employees; that Crain's actions resulted in multiple customer complaints; that Crain spoke over Wytovicz during the phone call in which Wytovicz discharged him; and that Pacific Breeze discharged Crain because of his deliberate refusal to follow directions.[3]

The trial court noted that many of Crain's challenges to the ALJ's factual findings turned on credibility determinations. The trial court affirmed the Commissioner's findings of fact and conclusions of law. Crain timely appeals.

## ANALYSIS

### I. STANDARD OF REVIEW

The Washington Administrative Procedure Act (APA), chapter 34.05 RCW, governs judicial review of a final decision by the Employment Security Department Commissioner. *Smith v. Emp't Sec. Dep't*, 155 Wn. App. 24, 32, 226 P.3d 263 (2010). We sit in the same position as the trial court "and apply the APA standards directly to the administrative record." *Id.* We review "the commissioner's ruling rather than the underlying ALJ decision, except to the extent that the commissioner adopts the ALJ's findings of fact." *Griffith v. Emp't Sec. Dep't*, 163 Wn. App. 1, 6, 259 P.3d 1111 (2011).

The Commissioner's decision is prima facie correct, and the challenging party has the burden of demonstrating invalidity. *Smith*, 155 Wn. App. at 32. Crain challenges the Commissioner's decision by asserting that, under RCW 34.05.570(3)(d) and (e), the

---

[3] We note that Crain challenged some of these ALJ findings for the first time in superior court, but the Department did not bring this to the superior court's attention or otherwise make any argument that the scope of review should be limited.

Commissioner based their decision on an error of law and substantial evidence does not support the decision. Br. of Appellant at 2, 5, 8.

We review the Commissioner's findings of fact for substantial evidence in the administrative record. *Griffith*, 163 Wn. App. at 6. "Substantial evidence is . . . evidence that 'would persuade a fair-minded person of the truth or correctness of the matter.'" *Id.* (quoting *Smith*, 155 Wash. App. at 33).

We review the Commissioner's legal conclusions for errors of law. *Id.* We may substitute our view of the law for the Commissioner's, but we give "'substantial weight' to the Commissioner's interpretation because of the agency's special expertise." *Id.* at 6-7 (quoting *Verizon Nw., Inc. v. Emp't Sec. Dep't*, 164 Wn.2d 909, 915, 194 P.3d 255 (2008)).

The determination of whether an employee's behavior constitutes misconduct is a mixed question of law and fact. *Tapper v. State Employment Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993). "On mixed questions of law and fact, we determine the law independently and then apply the law to the facts as found by the agency." *Hamel v. Emp't Sec. Dep't*, 93 Wn. App. 140, 145, 966 P.2d 1282 (1998).

## II. FINDINGS OF FACT

Crain challenges the following findings of fact:

- Crain berated another Pacific Breeze employee (FF 6).
- Crain disregarded his supervisor's instructions and followed his own priorities (FF 7).
- Crain was capable of performing his job duties but chose not to follow instructions (FF 8).
- Pacific Breeze does not provide written warnings to employees (FF 10).
- Crain's actions resulted in customer complaints (FF 11).
- Crain spoke over Wytovicz during the phone call in which Wytovicz discharged him (FF 12).
- Pacific Breeze discharged Crain because of his deliberate refusal to follow directions

(FF 14).

In challenging some findings of fact, Crain points out places where his testimony contradicts the testimony of Murphy and Wytovicz. He contends that the record does not support the finding that he berated a fellow employee because "a two-minute conversation occurred" and it "ended positively." Br. of Appellant at 2-3. He also argues that the record does not support a finding that his behavior resulted in multiple customer complaints because he testified about just one complaint, and Pacific Breeze's exhibits did not provide evidence of any other complaints.

In challenging other findings of fact, Crain argues that the record is lacking. He contends that the determination that he disregarded his supervisor's instructions "requires speculation as to when or how that alleged event occurred because it is not in the record." *Id.* at 3. He challenges the finding that he chose not to follow instructions because there "is no specific identified job duty or company directive that [he] knowingly refused to perform." *Id.* He challenges the finding that "Pacific Breeze does not provide written warnings to employees," arguing that the company's representatives only explained why Crain did not receive written warnings. *Id.* at 3-4. And he contends that he could not have spoken over Wytovicz because at one point during the hearing, Wytovicz testified that he had always been respectful to him. Finally, Crain challenges the finding that he deliberately refused to follow directions, arguing the record does not show a "specific direction" that he purposefully ignored. *Id.* at 5.

A.    Challenges Relying on Contradictions in the Record

Crain's challenges that rely on contradictions in the record all fail. Where witnesses offer conflicting testimony and the Commissioner finds certain witnesses more credible, this court does not substitute its credibility determinations for those of the agency. *See Smith*, 155 Wn. App. at

11

35-36. Crain's challenges require us to find his testimony more credible than the testimony of Murphy and Wytovicz. But the Commissioner determined that the Pacific Breeze witnesses were more credible, and we may not substitute our credibility determinations for those of the Commissioner.

Although Crain testified that his conversation with the other employee was innocuous, Murphy testified that Crain "really berated" the employee and that Crain had done so once before. CP at 34, 36. The ALJ and Commissioner found Murphy more credible, and Murphy's testimony provides substantial evidence that supports the finding that Crain had berated a fellow employee, even though Crain offered contradictory testimony.

Additionally, while Crain testified that his behavior only resulted in one customer complaint, Murphy testified that two customers had complained. Pacific Breeze's exhibits depicted only one customer complaint, but because the Commissioner found Murphy more credible, substantial evidence supports the finding that more than one customer took issue with Crain's conduct.

B.      Challenges Relying on a Lack of Evidence in the Record

Crain's challenges that rely on a lack of evidence in the record also fail. While Murphy and Wytovicz did not present highly detailed accounts of Crain disregarding instructions, they both testified to the same pattern of conduct.

The record shows that for at least six months, Murphy and Wytovicz gave Crain instructions on managing his workload. CP at 43, 187. Because Crain consistently fell behind in his work, they determined that he was not listening to them. Moreover, Murphy once rode with Crain and saw firsthand that Crain was not following his instructions. Wytovicz testified that Crain

repeatedly told him that he knew how to do his work better than Murphy did, demonstrating that Crain was making an active choice to disregard Murphy's instructions. While discussing his attempts to get Crain to follow instructions, Wytovicz said that generally, Pacific Breeze does everything it can to keep people employed, so the company does not "document things like that." CP at 44-45.

Crain correctly points out that while Wytovicz was testifying, he said Crain was always "super respectful to [him]." CP at 45. However, immediately after Wytovicz made that statement, he added, "But the senior manager, you don't get to talk to other people about them and not do your job and to go off on other employees. I had to part ways." *Id.* Moreover, both Murphy and Wytovicz testified that Crain spoke over Wytovicz during his final phone call with them.

Based on the Commissioner's credibility determinations and the evidence in the record, we hold that substantial evidence supports the challenged findings of fact.

### III. MISCONDUCT

Crain argues that the Employment Security Department "misapplied the law when it inferred that [Crain's] actions were misconduct." Br. of Appellant at 10. He contends that the record shows only "general performance complaints" and that it "fails to document critical details." *Id.*

A person who has been discharged for misconduct connected with their work is not eligible for unemployment benefits. RCW 50.20.066(1). A person engages in misconduct when they show willful "or wanton disregard of the rights, title, and interests of the employer or a fellow employee." RCW 50.04.294(1)(a). Additionally, a person engages in misconduct when they deliberately violate or disregard the "standards of behavior which the employer has the right to

13

expect of an employee." RCW 50.04.294(1)(b). "Insubordination showing a deliberate, willful, or purposeful refusal to follow the reasonable directions or instructions of the employer" is per se misconduct because it signifies a willful "or wanton disregard of the rights, title, and interests of the employer." RCW 50.04.294.

An employee engages in insubordination showing a deliberate refusal to follow instructions when they receive their employer's directions, demonstrate that they understand them, and nonetheless take actions contrary to them. For example, in *Smith*, we held that an employee engaged in insubordination under RCW 50.04.294(2)(a) when a supervisor instructed him "to turn over his laptop . . . and refrain from deleting anything on it," the employee "removed an unauthorized program he had previously installed" before turning the laptop in, and the employee explained his actions by saying that he owned the program and feared his employer would not return the laptop to him. 155 Wn. App. at 30-31.

Here, Crain committed per se misconduct by engaging in insubordination. Like the employee in *Smith*, Crain demonstrated through his actions and statements that he understood his employer's directions but decided to disregard them. The record shows that Crain frequently completed his assigned route in the sequence that made sense to him rather than the sequence Murphy gave him. Moreover, Crain did not prioritize work left over from previous weeks in spite of Murphy's requests. The fact that Crain told both Murphy and Wytovicz that his way of completing the route was better shows that he was purposefully refusing to follow instructions rather than simply making mistakes.

Because we conclude there was misconduct under RCW 50.04.294(1)(a) and (2)(a), we need not reach whether there was also misconduct under (1)(b).

No. 56976-1-II

CONCLUSION

We affirm and hold that Crain is not entitled to unemployment benefits.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, C.J.

We concur:

Lee, J.

Veljacic, J.